1 **RAINES FELDMAN LLP**
2 KATHY BAZOIAN PHELPS (SBN 155564)
*kphelps@raineslaw.com*
3 DAVID A. CASTLEMAN (SBN 326812)
*dcastleman@raineslaw.com*
4 1800 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
5 Telephone:  (310) 440-4100
Facsimile: (310) 691-1943
6
7
8 *Counsel for Bradley D. Sharp,*
*Permanent Receiver*
9

10                    **UNITED STATES DISTRICT COURT**

11                    **CENTRAL DISTRICT OF CALIFORNIA**

12

13 BRADLEY D. SHARP, as the          Case No. 2:21-cv-9183
Permanent Receiver for the Estate of
14 DIRECT LENDING INVESTMENTS,       **COMPLAINT FOR AVOIDANCE**
LLC, DIRECT LENDING INCOME         **AND RECOVERY OF ACTUAL**
15 FUND, L.P., DIRECT LENDING        **AND CONSTRCUTIVE**
INCOME FEEDER FUND, LTD., DLI      **FRAUDULENT TRANSFERS AND**
16 CAPITAL, INC., DLI LENDING        **FOR UNJUST ENRICHMENT**
AGENT, LLC AND DLI ASSETS
17 BRAVO, LLC AND THEIR             **JURY TRIAL DEMANDED**
SUCCESSORS, SUBSIDIARIES, AND
18 AFFILIATED ENTITIES,              **[Cal. Civil Code § 3439 *et seq.*]**
19
20
21                Plaintiff,
22
23          v.
24 DAISHIN SECURITIES CO., LTD.,
25          Defendant.
26
27
28

                                    1

1   Bradley D. Sharp, the Court-appointed permanent receiver (the "Receiver") for

2   the estate of Direct Lending Investments, LLC ("DLI"), Direct Lending Income Fund,

3   L.P. ("DLIF"), Direct Lending Income Feeder Fund, Ltd. ("DLIFF"), DLI Capital,

4   Inc. ("DLIC"), DLI Lending Agent, LLC, DLI Assets Bravo LLC ("DLIAB"), DLI

5   Assets, LLC ("DLIA"), and their successors, subsidiaries, and affiliated entities

6   (collectively, the "Receivership Entities"), hereby alleges and complains against

7   Daishin Securities Co., Ltd. ("Defendant") as follows:

8   **PRELIMINARY STATEMENT**

9   1.      Defendant was an investor in DLIF, which was placed into receivership

10   by the Securities and Exchange Commission (the "SEC") on April 1, 2019, after a

11   lengthy investigation uncovered that DLI and DLIF, through Brendan Ross ("Ross"),

12   who was leading DLI's pre-receivership operations and whose fraudulent intent may

13   be imputed to DLI and DLIF, was engaged in a pervasive fraud in the operation of

14   DLI and DLIF. Defendant received at least $49,774,952.67 of total transfers from

15   DLIF (the "Transfers"), which consisted of the return of Defendant's principal

16   investment of $47,158,700.00 (the "Principal") plus fictitious profits of $2,616,252.67

17   (the "Fictitious Profits"). At the time that the Transfers were made to Defendant, the

18   fraud in DLI and DLIF had become so pervasive that the enterprise had morphed into

19   a Ponzi scheme, and those Transfers were made in furtherance of the fraud and Ponzi

20   scheme. The Receiver brings this action to recover the Transfers for the benefit of the

21   defrauded DLIF investors who have collectively lost hundreds of millions of dollars.

22   2.      The fraudulent scheme was an intricate, multi-year fraud, orchestrated by

23   inflating the value and returns for the DLI-managed investment funds, including

24   DLIF, starting in or around early 2014 through March 2019. Central to Ross's efforts

25   to keep the scheme going (efforts that may have been unbeknownst to certain key

26   individuals within DLI) was ensuring that when investors requested a redemption, that

27   redemption was paid in full including with its massively overstated profits. As such,

28   throughout the life of the Ponzi scheme and DLIF's fraudulent operations, some

1    investors received returns on their investment in excess of the amounts of the
2    principal they originally invested.  Defendant was one such investor.

3    3.    However, those excess profits were not the result of legitimate business
4    activities, rather merely fictitious numbers meant to keep the scheme afloat. Instead,
5    DLIF used money from new investors to pay old investors. The money used to pay
6    the "net winners" like Defendant came from DLIF investors gulled by fraudulent
7    representations made by DLIF and DLI. Even if Defendant had no knowledge of the
8    fraud, Defendant still benefited from that fraud and was unjustly enriched by receipt
9    of the Fictitious Profits. Defendant should not be permitted to benefit from a fraud at
10   the expense of the other DLIF investors.

11   4.    This Action follows significant enforcement efforts by both the SEC and
12   the United States Department of Justice (the "DOJ"). On March 22, 2019, the SEC
13   filed an action against DLI, alleging fraud by DLI in violation of various federal
14   securities law, including Sections 206(1) and 206(2) of the Advisors Act,
15   Section 10(b) of the Exchange Act and Rule 10(b)(6), and Section 17(a) of the
16   Securities Act, and Section 207 of the Advisers Act ("SEC DLI Action").[1] On April 1,
17   2019, Bradley Sharp (the "Receiver") was appointed as receiver over the Receivership
18   Entities in the SEC DLI Action.[2]

19   5.    On August 11, 2020, Ross was arrested by special agents of the Federal
20   Bureau of Investigation ("FBI") following a grand jury indictment on ten counts of
21   wire fraud, including a forfeiture allegation, filed on July 30, 2020 (the "DOJ
22   Action").[3] The indictment charges that Ross made material misrepresentations that
23   defrauded investors beginning as early as December 2013, and that Ross began

24
25   [1] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.).

26   [2] *Id.* at Dkt. No. 10.

27   [3] *United States of America v. Brendan Ross, aka "Brandon Rosen,"* Case No. 2:20-cr-
28   00327-CSF (C.D. Cal.).

1    falsifying the monthly reporting of the funds as early as April 2014, long before DLIF
2    fraudulently transferred the Fictitious Profits to Defendant.   The indictment alleges
3    that Ross caused the monthly net asset value ("NAV") of DLIF to be cumulatively
4    inflated by over $300 million. The DOJ Action is pending before the same Court as
5    the SEC DLI Action.

6        6.    In addition to its complaint against DLI, the SEC filed a civil complaint
7    against Ross individually in this Court on August 11, 2020, alleging that Ross
8    defrauded investors of DLI, including the investors that invested through DLIF, and
9    seeking disgorgement of all funds received from his illegal conduct and civil penalties
10   (the "SEC Ross Action").[4] The SEC alleges that Ross orchestrated an intricate, multi-
11   year fraud by inflating the value and returns for the investment fund, starting in or
12   around early 2014 through March 2019.  The SEC Ross Action was transferred to the
13   same court as the SEC DLI Action, as a related action.[5]

14       7.    At the same time that the DOJ and the SEC were pursuing their actions
15   against Ross individually, the Receiver undertook a detailed investigation into the
16   Receivership Entities' business conduct prior to April 2019.  The Receiver's
17   investigation also uncovered the details of the pervasive fraud that existed from the
18   inception of DLI. Based on detailed findings, the Receiver discovered that the
19   operations of DLI and DLIF had effectively morphed into a Ponzi scheme no later
20   than mid-2016, as the fraud and commingling of funds grew. He prepared and filed
21   the Receiver's Report Regarding the Investigation of the Receivership Entities'
22   Business Conduct and Recommendations Regarding Distributions (the "Receiver's
23   Report"), a copy of which is attached hereto as Exhibit "1" and incorporated herein by
24   reference.

25       8.    The Transfers were made with actual fraudulent intent and are avoidable
26
27   _____
     [4] *SEC v. Brendan Ross*, Case No. 2:20-cv-7202-DSF-MRW (C.D. Cal.), Dkt. No. 1.
28   [5] *Id*., Dkt. No. 11.

1    and recoverable pursuant to Cal. Civil Code § 3439.04(1).

2        9.    The Fictitious Profits are recoverable as constructive fraudulent transfers

3    pursuant to Cal. Civil Code § 3439.04(2), whether or not Defendant had any

4    knowledge of the DLI entities' pervasive fraud, or true nature as a Ponzi scheme.

5    Additionally, Defendant should not be permitted to be unjustly enriched from a fraud

6    at the expense of the other investors so must at a minimum return the Fictitious

7    Profits.

8        10.    The Receiver therefore brings this proceeding pursuant to Cal. Civil

9    Code § 3439 *et seq.* to avoid actual fraudulent transfers and constructively fraudulent

10   transfers to Defendant and for unjust enrichment.

11                          **JURISDICTION & VENUE**

12       11.    This Court has jurisdiction over this proceeding under 15 U.S.C.

13   § 77v(a), and 15 U.S.C. § 78aa because the proceeding is ancillary to the SEC DLI

14   Action.

15       12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the

16   acts and conduct that form the basis of Receiver's causes of action occurred when

17   DLI and DLIF fraudulently offered investments for sale from its headquarters in

18   Glendale, California, in Los Angeles County, within this District.  This lawsuit is also

19   ancillary to the SEC DLI Action and the receivership.

20       13.    Defendant made the investment at issue through DLIF in the DLI

21   investment scheme – itself located in Los Angeles County, California within this

22   District – by signing a subscription agreement agreeing to be governed by the laws of

23   the State of California, a copy of which is attached hereto as Exhibit "2" (the

24   "Subscription Agreement").  This Court has jurisdiction over Defendant because it

25   purposefully availed itself of the benefits of this state, by doing business in the State

26   of California such that the United States District Court of California may exercise

27   personal jurisdiction over it.

28       14.    Defendant invested in a fund located in California, purposefully availing

itself of the protection of California law.

15. Defendant signed the Subscription Agreement, by which it made the investment in DLIF, with DLI as its General Partner and Defendant identified as an investor and limited partner.

16. The Subscription Agreement reflected that the addresses of DLI and DLIF were 1150 Foothill Blvd., Suite F, La Canada, California 91011.

17. Defendant knew or should have known that DLI and DLIF were located in California.

18. The Subscription Agreement contained a California choice-of-law provision at page 14, paragraph 6 as follows:

> This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of California and together with the rights and obligations of the parties hereunder, shall be construed under and governed by the laws of such state without giving effect to any choice of law or conflict of law provisions or rules that would cause the application of the domestic substantive laws of any other jurisdiction.

19. Pursuant to the Subscription Agreement, Defendant became a limited partner in DLIF, which is a limited partnership headquartered and located in California. Plaintiff's claims, as set forth below, arise directly out of Defendant's investment-related activities as a limited partner of DLIF.

20. DLIF was located in California for purposes of Cal. Civil Code § 3439.10(b).

21. Plaintiff's claims, as set forth below, arise directly out of the investment from Defendant's choice to invest in a fund (DLIF) that Defendant knew or should have known was located in California, and managed by an investment manager (DLI) that Defendant knew or should have known was located in California.

22. Plaintiff's claims, as set forth below, arise directly out of the voidable Transfers from a California entity to Defendant.

**PARTIES**

23.    Plaintiff Bradley D. Sharp is the Permanent Receiver for the Receivership Entities.

24.    Plaintiff Bradley D. Sharp is a federally appointed receiver acting pursuant to Federal Rule of Civil Procedure 66, the provisions of 28 U.S.C. §§ 754, 959, and 1692, as well as this District Court's April 1, 2019 Preliminary Injunction and Order Appointing Permanent Receiver ("Receivership Order") in the SEC Action.

25.    The Court appointed the Receiver to marshal and preserve all assets of the Receivership Entities. The Receiver is authorized and empowered to investigate claims and commence legal actions for the benefit and on behalf of the Receivership Entities as the Permanent Receiver deems necessary and appropriate.

26.    The Receiver is authorized to file this action pursuant to both the Receivership Order and the Order Granting Motion of Receiver for: (1) Authority to Pursue Avoidance Actions; (2) Approval of Proposed Procedures; and (3) Form and/or Limitation of Notice Under Local Rule 66-7.[6]

27.    Defendant Daishin Securities Co., Ltd. is a corporation located in South Korea at the address 343 Samil-daero Jung-gu, Seoul, Korea, and a former investor of DLIF.  On information and belief, some of Defendant's employees are located in California.

28.    Defendant executed a Subscription Agreement with DLIF.

**RELATED PARTIES**

29.    DLI was the investment manager of the funds set up by Ross to facilitate the fraud.  DLI was 100% owned by Ross and was the General Partner of DLIF.  As set forth in the diagram below, the DLI entities used a complex master-feeder fund structure, in which DLI was the investment manager of both the Master Fund (DLIC, defined below) and the Feeder Funds (DLIF and DLIFF, defined below).  DLI was

---

[6] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt No. 526.

located in Glendale, California.

30.    Direct Lending Income Fund, L.P. ("DLIF" or the "Onshore Feeder Fund") is the entity in which Defendant invested as a limited partner. As the Onshore Feeder Fund, DLIF was the entity into which funds initially flowed from investors, ostensibly so that those funds could eventually be invested with DLI counterparties, although in reality the funds invested were often used to satisfy redemption requests. DLIF did not make investments directly,[7] but rather funneled investors' money into DLIC, which operated as a master fund. The Organizational Chart below was located in the Receivership Entities' business records and sets forth the organizational structure of the Receivership Entities:



31.    DLIF was organized as a Delaware limited partnership on September 21, 2012 to operate as a private investment partnership. DLI was the general partner of

---

[7] DLIF did, however own DLI TC, LLC, an entity that was set up in connection with the realized investment in Talking Capital Partners I, LLC ("Talking Capital"), as that investment predated the master-feeder structure.

1   DLIF, and Ross was the Managing Member of DLI, which was the General Partner of
2   DLIF. A number of the limited partners of DLIF reside in the State of California, in
3   Los Angeles County.

4          32.    Direct Lending Income Feeder Fund Ltd ("DLIFF" or the "Offshore
5   Feeder Fund;" and together with DLIF, the "Feeder Funds"), a Cayman Islands
6   company, was formed to facilitate investments from non-United States domiciled
7   investors, but otherwise served the same function as DLIF, just for offshore investors.
8   As set forth below, Defendant initially invested in DLIF, and then continued to invest
9   in DLI through DLIFF. The claims set forth in this Complaint do not relate to arise
10  from transfers to or from DLIFF.

11         33.    DLI Capital, Inc. ("DLIC" or the "Master Fund") was a Nevada
12  Corporation with its principal place of business in Glendale, California and, like the
13  Feeder Funds, was managed by DLI.  The Master Fund was wholly owned by the
14  Feeder Funds.

15         34.    DLI Assets Bravo, LLC ("DLIAB") was a Nevada limited liability
16  company that was a wholly owned subsidiary of the Master Fund.  After money
17  flowed from outside investors to the Feeder Funds to the Master Fund, it was then
18  supposed to flow to DLIAB to hold the actual investment with DLI counterparties.
19  The cash flows generated from those investments were supposed to flow back to the
20  Master Fund and then to the Feeder Funds, but in reality were commingled with new
21  investor money from DLIF.

22         35.    DLI Assets, LLC ("DLIA") was a Nevada limited liability company that
23  was a wholly owned subsidiary of the Master Fund.  DLIA was formed to hold a
24  portfolio of whole loans that the DLI entities acquired in foreclosure following the
25  default of Dealstruck Holdings, Inc., a former counterparty of the DLI entities.  The
26  cash flows generated from those loans were also supposed to flow back to the Master
27  Fund and then to the Feeder Funds, but in reality those cash flows were also
28  commingled with new investor money from DLIF.

9

36.     DLI Lending Agent, LLC ("DLILA") is a Delaware limited liability company that served as administrative agent with respect to a number of the credit facilities with counterparties in which DLI entities invested, facilitating the collection of payments, and serving as intermediary between borrowers and lenders.  DLILA held a lending license and was 100% owned by DLI.

37.     Ross was the founder, 100% owner, managing member, and Chief Executive Officer of DLI, and a member of the board of directors. As the managing member of DLI, Ross was able to control DLI and DLIF (as DLI was the general partner of DLIF).  Ross is an individual residing in the County of Los Angeles.

## PROCEDURAL HISTORY

38.     On March 12, 2021, the Receiver filed a Motion for Authority to Pursue Avoidance Actions and for Approval of the Proposed Procedures in the SEC DLI Action (the "Procedures Motion").[8]  The Court granted the motion on April 6, 2021.[9]

39.     The Procedures Motion sought authority for the Receiver to send demand letters with settlement offers to net winners, which the Receiver did to those net winners over a certain threshold. Over 540 of the over 700 net winners have responded and entered into settlement agreements.

40.     The Procedures Motion further provided that for any net winner who did not accept the settlement within 60 days of being a demand letter, the Receiver was authorized to file an avoidance action such as the instant action.

41.     Defendant was sent a demand letter on April 28, 2021, and the Receiver has sent several follow up communications. Defendant has not accepted the Receiver's settlement offer.

## DEFENDANT'S INVESTMENT IN DLI

42.     On March 30, 2017, Defendant signed the Subscription Agreement

[8] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt. No. 356.

[9] *Id.*, Dkt. No. 526.

agreeing to invest $18,730,600 in DLIF. Ross countersigned the Subscription Agreement on behalf of DLIF. Defendant invested that amount on March 30, 2017 and invested even more four weeks later.

43. In the Subscription Agreement, § 1(a), at p. 8, Defendant represented and warranted that the "Partnership Interest is being purchased for the undersigned's own account without the participation of any other person, with the intent of holding the Partnership Interest for investment and without the intent of participating, directly or indirectly, in a distribution of the Partnership interests."

44. In the Subscription Agreement § 1(e), at p. 8, Defendant represented and warranted that "the undersigned can sustain a substantial loss of this investment in the Partnership."

45. In the Subscription Agreement, Defendant represented and warranted that the "address set forth on the signature page hereto is the undersigned's true and correct address." Subscription Agreements § 1(f), at p. 9. Defendant provided "343 Samil-daero Jung-gu, Seoul, Korea" as its address in the investor questionnaire section in the Subscription Agreement, at p. 4.

46. In the Subscription Agreement § 1(h), Defendant represented and warranted that the "execution and delivery of this Subscription Agreement by the undersigned has been duly authorized, and this Subscription Agreement constitutes the valid and binding agreement of the undersigned."

47. Defendant invested the total amount of $47,158,700.00 on the following two dates:

| Date | Amount |
|------|--------|
| March 30, 2017 | $18,730,600.00 |
| April 27, 2017 | $28,428,100.00 |

48. Defendant invested those amounts in DLIF. Defendant invested additional amounts in DLIFF beginning in June 2017 and received separate redemptions from DLIFF. The claims in this complaint solely relate to Defendant's

investment in, and receipt of Fictitious Profits from, DLIF.

49.     The Transfers, consisting of both the return of Defendant's Principal and payment of the Fictitious Profits, are identified on Exhibit 3 attached hereto, and totaled $49,774,952.67 between May 30, 2017 and April 25, 2018.

50.     Defendant purchased the Partnership Interests for its own account pursuant to the terms of the Subscription Agreement.

51.     Defendants requested to receive certain of the Transfers as periodic withdrawals to a bank account a KEB Hana Bank with the account name "Daishin Securities Co., Ltd."

52.     Defendant requested to receive no fewer than five of the Transfers as partial or full redemption requests to a bank account a KEB Hana Bank with the account name "Daishin Securities Co., Ltd."

53.     The Transfers were made to the bank account of Defendant over which Defendant exercised full dominion and control.

54.     Defendant was the initial transferee of the Transfers.

55.     Defendant had legal title to the Transfers when the Transfers were paid to Defendant.

56.     Defendant was the beneficial owner of the DLIF investment, and informed DLI via email in 2018 that it was "neither a fund nor SPV" [special purpose vehicle] and that it held "100% of the Fund (DLIFF [or DLIF]) as beneficial owner."

57.     Defendant's broker indicated to DLI that its investment did not require approval from the Financial Supervisory Service of Korea because "it's considered direct investment from Daishin."

58.     Defendant did not invest funds in DLIF that belonged to other beneficial owners.

59.     On May 11, 2017, the Senior General Manager of Defendant executed a Request for Withdrawal reciting that Defendant "is a Partner in the Partnership" and directing that "Periodic Withdrawals in an amount equal to the amount of the Net

Profits allocated to the Investor's Capital Account for each month" be paid to Defendant's bank account. A true and correct copy of the May 11, 2017 Request for Withdrawal is attached hereto as Exhibit "4."

60.     On May 29, 2017, the Senior General Manager of Defendant executed a Request for Withdrawal reciting that Defendant "is a Partner in the Partnership" and directing that the requested withdrawal amount of $134,376.67 from Defendant's "Capital Account in the Partnership" be paid to Defendant's bank account. A true and correct copy of the May 29, 2017 Request for Withdrawal is attached hereto as Exhibit "5."

61.     On August 23, 2017, the Senior General Manager of Defendant executed a Request for Withdrawal reciting that Defendant "is a Partner in the Partnership" and directing that the requested withdrawal amount of $15,187,000.00 from Defendant's "Capital Account in the Partnership" be paid to Defendant's bank account. A true and correct copy of the August 23, 2017 Request for Withdrawal is attached hereto as Exhibit "6."

62.     On September 21, 2017, the Senior General Manager of Defendant executed a Request for Withdrawal reciting that Defendant "is a Partner in the Partnership" and directing that the requested withdrawal amount of $11,776,000.00 from Defendant's "Capital Account in the Partnership" be paid to Defendant's bank account. A true and correct copy of the May 29, 2017 Request for Withdrawal is attached hereto as Exhibit "7."

63.     On January 19, 2018, the Senior General Manager of Defendant executed a Request for Withdrawal reciting that Defendant "is a Partner in the Partnership" and directing that the requested withdrawal amount of $3,543,600.00 from Defendant's "Capital Account in the Partnership" be paid to Defendant's bank account. A true and correct copy of the January 19, 2018 Request for Withdrawal is attached hereto as Exhibit "8."

64.     On March 28, 2018, the Senior General Manager of Defendant executed

a Request for Withdrawal reciting that Defendant "is a Partner in the Partnership" and directing that the requested withdrawal amount of 100% of the Limited Partner's Capital Account be paid to Defendant's bank account. A true and correct copy of the March 28, 2018 Request for Withdrawal is attached hereto as Exhibit "9."

65.    Defendant had the ability to freely appropriate the Transfers when the Transfers were made to Defendant.

66.    Defendant did in fact freely appropriate the Transfers by paying some of the funds received to itself as commissions. The Receiver is informed and believes that Defendant otherwise used its discretion as to how and when to spend or disburse the balance of the Transfers.

67.    As of April 12, 2018, Defendant had received back the full amount of its Principal. The amount of the Fictitious Profits transferred to Defendant were all transferred on or after that date. By April 12, 2018, as set forth below, fraud had pervaded all of DLIF's operations.  By that date, also as set forth below, DLIF was also being operated as part of the larger Ponzi scheme being operated by Ross, and the Transfers to Defendant were in furtherance of that scheme.  DLI was also insolvent by that date.

68.    The Transfers to Defendant are avoidable and recoverable transfers pursuant to Cal. Civ. Code 3439 et seq.

69.    Defendant was also unjustly enriched by the transfer of the Fictitious Profits at the expense of DLIF and its creditors.

## ALLEGATIONS OF THE DLI ENTITIES' FRAUD

### A.    Structure and Stated Purpose of the DLI Entities

70.    The DLI entities operated as a master/feeder structure, in which investors would first invest in the Feeder Funds, DLIF (onshore investors) and DLIFF (offshore investors). DLIF and DLIFF owned the Master Fund, DLIC, and funds from investors flowed from the Feeder Funds to the Master Fund.  Until DLIFF was formed in 2016, DLIF was the only Feeder Fund. Both Feeder Funds and the Master Fund were all

1  managed by the same investment manager, DLI, which was 100% owned by its
2  managing member, Ross.

3      71.    The Master Fund had two wholly owned subsidiaries, DLIA and DLIAB.
4  DLIAB and DLIA used the funds provided by the Master Fund to make loans to
5  various companies.  The purported returns from those loans would then flow back up
6  through the Master Fund to the Feeder Funds, where those proceeds were supposed to
7  be used to pay investors in the Feeder Funds.

8      72.    The purported initial investment objective of the DLI entities was to net
9  for its investors an annualized 10% to 14% return. DLI, as investment manager,
10  advertised that it could achieve those returns by investing in short-term loans, lines of
11  credit, purchased receivables, or other debt obligations. DLI focused on loans that
12  originated through online lending platforms. As part of the scheme, the Master Funds'
13  portfolio, over time, became concentrated with substantial loans to a small number of
14  highly risky counterparties (the "Counterparties").

15      73.    In its early private placement memoranda, DLIF stated to potential
16  investors that the loans in which it invested typically had the following qualities:
17  (1) issued by qualified, established businesses; (2) durations of six to eighteen
18  months; (3) fully amortizing over the term through daily or weekly ACH withdrawals
19  from the borrower's account; and (4) may be guaranteed by one or more principals,
20  and may be secured by the assets of the borrower. Contrary to those statements, the
21  nature and quality of the investments changed substantially over time and were not of
22  the nature represented at the time the Transfers were made.

23  **B.    DLI's Initial Failure to Register with the SEC**

24      74.    In its initial period of operation, DLI was not registered with the SEC as
25  an investment advisor, and its assets under management fell below the $100 million
26  threshold for registration.  As such, DLI, which supposedly marketed itself to high-
27  net-worth accredited investors, was able to avoid regulatory scrutiny regarding the
28  initial period of its operation.

75.     By December 2014, DLI's assets under management had reached $100 million. By January 1, 2015, the assets under management had grown to $118 million. Yet DLI failed to register with the SEC as a registered investment adviser.

76.     As a result, DLI was able to continue to operate without scrutiny and oversight by the SEC, and its investors were deprived of the protections afforded by the Investment Advisers Act of 1940.

77.     Finally, on February 1, 2016, DLI registered with the SEC as an investment advisor.

**C.     DLI's Communications with Investors**

78.     DLI, as the general partner of DLIF, and Ross, DLI's managing member, regularly communicated with the DLIF investors through monthly newsletters distributed through the administrator of DLIF. Ross drafted and signed the monthly newsletters, which included statements about DLI's assets under management and the Master Fund and DLIF's monthly returns, which were often overstated as set forth below.

79.     DLI also provided prospective and current investors with presentation documents that included information about the Master Fund's monthly returns and other material information about the Master Fund's performance, which were often overstated as set forth below.

80.     DLI provided the DLIF investors with monthly account statements, including the account balance and net/profit loss figures for each investor that were derived from the Master Fund's NAV, net interest income, and each investor's percentage allocation; and provided the underlying data for such calculations to the DLIF administrator.  Because the DLIF NAVs were intentionally overstated, as set forth below, the account balances were inflated, and redemptions based on those overstated NAVs were therefore artificially inflated and intentionally fictitious. The Transfers, including the Fictitious Profits, were calculated and made based on

fictitious NAVs, and those Transfers were made in furtherance of the fraudulent scheme with actual fraudulent intent.

81.    DLI maintained an online investor portal that provided investors with detailed information regarding the Master Fund and its subsidiaries' asset portfolio and specific counterparties, including the valuation of various counterparty positions by unpaid and principal balance and profit and loss information for different periods of time. However, DLI often overstated the valuation with respect to specific counterparties, as set forth below.

82.    DLI provided to some prospective and current investors "default sensitivity analysis" spreadsheets that detailed the amount of the Master Fund's historical write downs, and sometimes extensive detail in DLI's individual investment positions such as QuarterSpot, even though DLI intentionally failed to write down its positions in loans it knew to be non-performing, especially with respect to QuarterSpot.

83.    DLI provided the Master Fund's audited financial statements to DLIF, which included valuations of the Master Fund's investments as well changes in the depreciation of investments that were impacted by the inclusion of loans that were written off because they were non-performing. Valuations therefore were intentionally and artificially inflated when non-performing and underperforming loans were not properly included.

**D.    The Value of the Loans That DLI Chose For Its Funds Were Falsely Overvalued**

84.    The majority of the assets in which the DLI entities invested, at the direction of DLI, were Level 3 assets, meaning that they were illiquid, and could not be valued through observable measures, such as market prices. The assets were supposed to be valued at fair market value. DLI valued the positions internally, on a monthly basis. Through this internal valuation process, which was largely controlled by Ross, DLI intentionally and artificially inflated the asset values of the Master Fund

17

and its subsidiaries, and in turn, overvalued DLIF and the NAVs reported to the DLIF investors.

85.    By early to mid-2017, many of DLI's chosen investment platforms were in financial distress, but the resulting looming financial difficulties of DLIF were hidden from DLIF investors.

86.    Ross, DLI, and DLIF operated the DLIF fraudulent investment scheme with fraudulent intent that lured in investors, mislead them to retain their funds invested in DLIF under the guise of promised fictitious returns, and transferred fictitious profits to certain redeeming investors with the actual fraudulent intent of keeping up the façade of a legitimate business.

87.    Central to the operation of the fraud was the concealment by Ross, DLI and DLIF of the true nature and value of the loans with counterparties, using various deceitful acts to mislead investors into thinking the loans were far more valuable than they were. Some of the more egregious examples of such concealment were prevalent in QuarterSpot, VOIP Guardian, Dealstruck, and LoanHero – plus numerous other investments that had serious differences between the way they were operated and the way they were represented to DLIF investors.

88.    **QuarterSpot**.  One of the most egregious examples of Ross's, DLI's and DLIF's malfeasance was the relationship with QuarterSpot, one of DLI's earliest and largest Counterparties. Through the fraudulent actions of DLI's owner and managing member, Ross, DLI massively overstated the value of its QuarterSpot position. For the period of August 2013 to June 2017, the QuarterSpot loan portfolio was a significant and steadily growing position for DLI. DLI represented to investors that QuarterSpot was one of DLI's best-performing positions. Ross, and therefore DLI and DLIF, knew of serious problems relating to the QuarterSpot loan portfolio and concealed these issues to the detriment of DLIF investors (in part aided and abetted by QuarterSpot itself) by, among other things:

- Falsifying thousands of payments for non-paying or late-paying QuarterSpot borrowers, causing the false appearance that non-paying loans were

performing, and funding those payments by rebating QuarterSpot's service fees;

- Affirmatively misrepresenting the status of delinquent and/or non-paying loans to DLI investors and/or prospective investors;

- Falsely inflating QuarterSpot's loan balances, cumulatively, for the period 2014 to 2017, by $53 million;

- Preventing DLI from taking an adequate amount of loan reserves;

- Overstating DLI's valuation of the QuarterSpot Loan Portfolio and the Master Fund;

- Charging excessive performance and management fees;

- Overstating its return by about 2%, on average, for the period 2014 to 2017;

- Collecting over $11 million in excess fees, for the period 2014 to 2017; and

- Undermining the ability of DLIF investors and potential investors to assess whether continued investment in QuarterSpot, or similar assets, was warranted.

89.   **VOIP Guardian**.   Another example of intentional fraudulent intent in overstating the values of the DLI-managed funds is the VoIP Guardian loan portfolio. DLIF and DLI, through Ross, intentionally misrepresented the risk of that portfolio to its investors. Even though VoIP Guardian's business model was largely factoring invoices of telecommunications carriers in developing countries, which were highly risky Tier 3 companies, DLIF implied to the DLIF investors that the risk of its VoIP Guardian investment was low because of the purported involvement of larger Tier 1 companies such as AT&T and Verizon.

90.   As early as February 2017, Ross was also aware that an active criminal investigation was underway in the Netherlands focused on VoIP Guardian's Tier 3 telecommunications business and counterparties, based on evidence that those counterparties appeared to be spoofing minutes to overstate charges and possibly also using those businesses for money laundering. DLIF, through DLI and Ross, concealed

1    that fact from investors, as well as the amounts loaned to VoIP Guardian were against

2    receivables that showed no indicia of legitimacy. The losses in connection with the

3    VoIP Guardian loan portfolio, which had ballooned to over $200 million at one point,

4    will likely be well over $100 million once finalized.

5         91.    **Dealstruck**. Another example of the fraudulent conduct is the intentional

6    misrepresentation of the value of loans its portfolio from Dealstruck Holdings, Inc.

7    ("Dealstruck"), a company in which Ross held a personal interest. Under Ross's

8    direction and with fraudulent intent, DLI, as the general partner of DLIF, failed to

9    adjust the valuations of the poorly performing portfolio or to disclose the underlying

10   weaknesses in the collateral, but instead took actions that increased the position to

11   protect Ross's individual position at the expense of the investors. DLI was ultimately

12   forced to foreclose on the loan portfolios in December 2016, and the liquidation was

13   not completed until October 2019, after the Receiver was appointed.  The total return

14   was less than 2.8%, far less than the double-digit returns promised to investors. The

15   Dealstruck transactions were orchestrated with the intent to mislead the DLIF

16   investors.

17        92.    **LoanHero**.  The DLI-managed funds also invested heavily in LoanHero,

18   which was touted by DLI as an early successful consumer loan investment portfolio.

19   DLIF, and later the Master Fund after the 2016 restructuring, provided LoanHero with

20   a loan facility at a 16% interest rate. However, as early as June 2016, DLI's internal

21   analysis showed that the returns from LoanHero were around 6.1%, well below what

22   was needed to make the payments on a 16% loan facility.

23        93.    Ross had a personal investment in LoanHero. Rather than reduce the

24   funding and the risk, in November 2016 Ross increased the loan commitment to $25

25   million, and again in October 2017 to $42.5 million. In December 2017, DLI was

26   forced to direct that DLIC foreclose on the LoanHero portfolio. However, DLI failed

27   to disclose that fact in investor letters from December 2017 through March 2018.  As

28   with Dealstruck, the liquidation was not completed until after the Receiver was

appointed. The total return was less than 3%, far less than the double-digit returns promised to the DLIF investors.

94.     The fraud with respect to QuarterSpot, VoIP Guardian, Dealstruck, and LoanHero epitomized the intentional concealment and fraudulent intent of DLI and DLIF, which was pervasive throughout the investment program.

95.     Several other investments, including those which have not made part of the public record, have had similar problems. In sum, DLI's limited business investments were overrun by fraudulent conduct that lured and retained investors who would not have invested had they known the true facts. Some of the investments do not appear to have ever been legitimate business operations. Even those that involved nominally legitimate business operations could not support the dramatically overstated returns that DLI and Ross promised to DLIF investors.

96.     DLIF continued raising capital and paying fictitious profits to investors like Defendant, enabling DLIF to continue its fraudulent operations under the guise of a very-successful fund. In order to continue DLI's scheme and attract new investment, DLIF, DLI, and Ross concealed the underperformance of most of its loan portfolio from investors and made the Transfers to Defendant as part of the fraudulent scheme to perpetuate the fraud by repaying the Principal as well as the Fictitious Profits to avoid detection of the fraudulent scheme.

**E.     Ross's Secret Ownership of Counterparty Stakes and Other Fraudulent Acts**

97.     As set forth above, Ross controlled DLI, DLIF and the Master Fund. Ross also held ownership stakes in a number of Counterparties, which were not made public or were concealed through stakes held by family members or family trusts. Because of Ross' equity interests, DLI was not in fact truly independent of these borrowers, and the transactions in which DLI directed the funds under its management to undertake invested were influenced by Ross's personal interests, to the detriment of the DLIF investors.

98.    Ross had as many as eight personal investments in Counterparties, typically not disclosed to investors or disclosed long after Ross's investment had resulted in decisions harmful to DLIF and its investors.  Known investments in which Ross had a personal stake include IOU Central, Inc.; LoanHero, LLC; Realty Mogul, Inc.; Nativa Capital Management LLC; Quarterspot, Inc.; Dealstruck Holdings, Inc.; VoIP Guardian Partners I, LLC; and another investment currently being unwound by the Receiver (the "Known Ross Personal Investments").

99.    The Known Ross Personal Investments received a total of $647 million out of the $1.9 billion in total loans to Counterparties, or 39%.   The Receiver estimates an underreported allowance for doubtful accounts and bad debt expense of $343.7 million as of March 31, 2019, the day before the Receiver was appointed.

100.   Ross benefited from the scheme in a number of ways, extracting at least $31.4 million from DLI. Ross charged excessive management fees to DLI, which were based on the intentionally inflated NAVs of the DLI-managed funds. As set forth below, those NAVs were substantially overstated, resulting in overpayments to Ross.

101.   Ross also created Robin Hill Investments, LLC ("RHI") with members of his family, which created a subsidiary Robin Hill Services, LLC ("RHS") that had a contract with DLI to provide administrative services.   However, RHS entities provided very few services to DLI, far less than the $10 million per year that was contemplated.  Most of the funds were paid from RHS to RHI, and to RHI's investors, indicating that the entities were little more than a sham designed to enrich Ross and his family at the expense of DLIF investors.

102.   The Receiver's investigation is ongoing and may uncover additional fraudulent activities by DLI, DLIF, and Ross, further demonstrating that DLI was operating itself and the funds under its management as a fraudulent enterprise, and as a Ponzi scheme.

**F.    DLIF Greatly Overstates Its Net Asset Values**

103.   Ross also caused DLIF to provide reports with inflated NAVs, which served several purposes: (a) the inflated values indicated to investors that the DLI funds were better investments than they were; (b) the management fees charged by Ross, 1% of the Master Fund's gross asset value, were based on the inflated NAVs; (c) the performance fees charged by DLI, 20% of the increased value of the Master Fund, were based on the inflated NAVs; and (d) the commission payments to the brokers dealers and finders that helped Ross facilitate his scheme were based on the inflated NAVs. Because DLI's portfolio was intentionally overvalued, excess fees were charged due to the way that the fees were calculated.

104.   The NAV of DLIF was dramatically overstated beginning in 2016, and the overstatement generally became worse over time. In January 2016, the overstatement was at least $46 million.  By January 2017, the overstatement had increased to at least $191 million.  By January 2018, the overstatement had nearly doubled, to at least $364 million.

**G.    DLIF Commingles Investor Money so that It Can Use Funds by New Investors to Pay Redemptions**

105.   Substantial redemptions and distributions were financed by fundraising efforts and paid from the commingled funds of the victims.

106.   From the inception of DLI and DLIF, investor money was commingled with other investor money and loan portfolio proceeds. Some investor money was directed into the Master Fund's subsidiaries to make actual investments, while some investor money never even made it that far and was used to pay redemptions to other investors before the funds had ever been invested.

107.   For the new investor money that was actually directed to the Master Fund's subsidiaries to make investments, investor money was generally received by DLIF into subscription bank accounts. Those monies were then generally transferred to the DLIF sweep bank account, then to the Master Fund's sweep bank accounts, and

then to the DLIAB sweep account used for funding loans to the Counterparties. Some of those monies that actually made it to DLIAB were just cycled back to the DLIF bank account as purported loan profits from Counterparties, leading to the overstatement of the NAV and fictitious profits paid to DLIF investors, such as the Transfers made to Defendant.

108.   Some of the new DLIF investor monies, however, never made it to the Master Fund bank account. Instead, the DLIF investor funds were deposited directly into the redemption bank account of DLIF to pay prior DLIF investors. Ross, with fraudulent intent, sought new investor monies that were used to pay earlier investors their promised returns.

109.   From inception to March 2019, $945.3 million was paid to investors who redeemed, like Defendant. However, only $192.4 million of those redemptions, or 20%, came from portfolio investments. Because the funds from new investments and payments from Counterparties were commingled, it would not be reasonably possible to trace the actual funds paid to Defendant to any legitimate business revenue.

110.   Nearly 60% of the monies paid to earlier investors in connection with their redemption and distribution requests ($560.4 million) came from subscriptions from new investors. Another 20% came from the outright sale of participation proceeds.

## H.   Ponzi Scheme Indicia and Badges of Fraud

111.   There are numerous indicia that DLIF was operating as a Ponzi scheme at least as of April 30, 2016. Even if not an established Ponzi scheme, the factors set forth herein constitute sufficient badges of fraud that establish that the Transfers, including the Fictitious Profits, were made by DLIF with actual fraudulent intent.

112.   Although DLI invested some of the DLIF investor funds in loan portfolios that involved some counterparties that had legitimate business operations, the investment in those loan portfolios was overrun by the pervasive fraud run by Ross, DLI and DLIF in operating an investment scheme that fraudulently lured in

investors, made ongoing misrepresentations to try to hold on to investor funds, and paid false returns to investors that sought to redeem to keep the scheme from collapsing. The fraudulent operations by DLI and DLIF directly resulted in the Fictitious Profits being paid to Defendant. When Defendant redeemed fully its investment in April 2018, DLIF, under the control of Ross and DLI, paid the Fictitious Profits to Defendant with actual fraudulent intent as part of the massive fraudulent enterprise that generated those Fictitious Profits.

113.   As set forth above, DLIF, DLI and Ross grossly overstated to investors both the value of the DLI-managed funds and made other material misrepresentations and omissions with the intent to defraud investors. Such misrepresentations and overstatements were made to Defendant prior to and at the time the Transfers were made.

114.   As set forth above, later DLIF investor funds were used to pay earlier DLIF investors, including Defendant.

115.   As set forth above, funds were commingled, as DLIF failed to maintain separate investor accounts.  DLI even caused DLIF to use new investments to pay old investments without even bothering to direct the monies received to the Master Fund subsidiaries to be invested. The funds used to make the Transfers to Defendant were paid from funds that were commingled with other investors' money.

116.   Later investors generally received lower returns than earlier investors with initial reported net returns as high as 13% and later reported returns as low as 7%, on an annualized basis.

117.   To entice investments, DLI also caused DLIF often to pay 20% commission to broker dealers and finders, generally based on overstated NAVs.

118.   DLIF, through Ross, tried to avoid redemptions by encouraging investors to extend their investments rather than receive back their principal.  The redemptions that were completed, including the Transfers to Defendant, were made in furtherance of DLIF's fraud and Ponzi scheme.

119.   Ross, as DLI's sole member, benefited from his scheme, including by (1) taking payments and allocations of at least $31.4 million from DLI; (2) profiting from investments in companies in the "FinTech" lending space hoping to capitalize on the growth in that sector, while personally aggrandizing himself as an investment guru and claiming to be an expert on investing money through non-traditional loans to new businesses; (3) having DLI receive its own return from its investment of fees of $17.6 million in redemptions in excess of principal invested at a time when DLIF could not even satisfy redemption requests or pay promised returns to legitimate investors; and (4) causing the DLI-managed funds to increase their investment in bad or fraudulent investments in which Ross had a personal stake.

## I.   DLIF was Insolvent When the Transfer was Made

120.   As of at least April 30, 2016, DLIF was insolvent. As of April 30, 2016, DLIF had liabilities totaling $483 million and assets of $478 million. Under a balance sheet test, DLIF was insolvent as the sum of its liabilities were greater than the sum of its assets at a fair valuation. It remained insolvent at least from then to April 1, 2019, when the Receiver was appointed.

121.   DLIF was not engaged in profitable activity that could have led to the repayment of all net invested capital of the DLIF investors, let alone the promised returns.

122.   At the time the Transfers were made, DLIF operated with unreasonably small capital, as it did not have the ability to repay investors' capital with promised profits.

123.   In light of the pervasive fraud, all investors had a claim of restitution and rescission up to the unpaid amounts of their initial investments, all of which were liabilities of DLIF. Those liabilities were not contingent.

124.   As a Ponzi Scheme, DLIF was inherently insolvent at all times since at least April 30, 2016.

1

**J.      DLI's Operations Caused Substantial Investor Losses**

2

125.   DLI's overall business operations of the Master Fund caused losses to the

3

investment portfolio and an estimated $250.7 million in aggregate investor cash

4

losses.

5

126.   The investors who remained in DLIF when the Receiver was appointed

6

have claims in the receivership, generally at the Class 4B level pursuant to the Court-

7

approved distribution plan (the "Distribution Plan").[10] The net proceeds from this

8

lawsuit will to be used to pay those Class 4B investors who have been damaged by the

9

scheme and the Transfers made to Defendant. To date, those creditors have been paid

10

back approximately a minimum 31% of their investment based on the rising tide

11

Distribution Plan, with an additional 12% pending approval by the Court.

12

127.   The Receiver estimates that investors in Class 4B will have aggregate

13

losses in excess of $100 million even if the entire DLI portfolio is unwound and the

14

Receiver is able to collect all of the fictitious profits that were paid to other DLIF

15

investors.

16

128.   The Class 4B investors are creditors of DLI and DLIF.

17

129.   DLI and DLIF currently have one or more creditors whose claim arose

18

before DLIF made payments to Defendant in excess of Defendant's Principal

19

Investment. One such example of such a creditor is identified as Generic Investor I.D.

20

No. 128, who held a claim of $1,000,000 as of May 27, 2014 that grew to $4,000,000

21

as of July 26, 2016. That claim remained unpaid and outstanding as of the date of the

22

Receiver's appointment.

23

130.   DLI and DLIF currently have one or more creditors whose claim arose

24

after DLIF made payments to Defendant in excess of Defendant's Principal

25

Investment. One such example of such a creditor is identified as Generic Investor I.D.

26

No. 1831, who held a claim of $5,000,000 as of December 31, 2018. That claim

27

28

---

[10] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt. No. 337 (approving Dkt. No. 321).

remained unpaid and outstanding as of the date of the Receiver's appointment.

## FIRST CLAIM FOR RELIEF

### (For Avoidance and Recovery of Fraudulent Transfers
### Pursuant to California Civil Code §§ 3439.04(a)(1), 3439.07(a)(1), and 3439.08(b)
### and California Common Law)

131.   The Receiver incorporates by this reference paragraphs 1 through 130, above, as though set forth herein in full.

132.   This is a claim to avoid and recover fraudulent transfers pursuant to Cal. Civil Code § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyance.

133.   The Receiver may recover the Transfers for the benefit of the estate from the Defendant or from the entity or entities for whose benefit the Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (b)(2).

134.   Defendant began investing in DLIF on March 30, 2017 pursuant to the terms of the Subscription Agreement.

135.   Defendant received the Transfers from DLIF totaling $49,774,952.67.

136.   As a result of the payments made by DLIF, Defendant received the Fictitious Profits of $2,616,252.67 in addition to the return of the Principal.

137.   The Transfers made to Defendant by DLIF were made with the actual intent to hinder, delay, or defraud DLIF's creditors.

138.   The Transfers made to Defendant by DLIF were also made in furtherance of DLIF's fraud and Ponzi scheme.

139.   The Transfers were made as a part of DLIF's fraud. DLIF, through the Master Fund and its subsidiaries, entered into the underlying investments in furtherance of the DLIF fraudulent scheme. These sham transactions provided DLIF with the funds it required to satisfy already existing obligations that were part of the

fraudulent scheme. Furthermore, DLIF entered into additional transactions with other investors at a later time that ultimately provided DLIF the funds necessary to pay Defendant the Transfers. This pattern of conduct of using new money to pay earlier obligations constitutes a Ponzi scheme or similar fraud whereby funds received from later fraudulent transactions were used to fund prior obligations.

140.   As alleged herein, there are a multitude of badges of fraud present with respect to the Transfers made to the Defendant. The existence and sheer number of the badges of fraud present in this matter, present at the time of each of the Transfers to Defendant, indicate that DLIF intended to hinder, delay, or defraud its creditors.

141.   DLIF and the other Receivership Entities had creditors whose claims arose before the Transfers were made to Defendant.

142.   DLIF had the actual intent to delay, hinder, or defraud creditors, and made the Transfers to delay, hinder, or defraud creditors. Consequently, the Transfers were fraudulent pursuant to Cal. Civil Code § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyances.

143.   Because the Transfers are voidable under Cal. Civil Code § 3439.04(a)(1) and under California common law on fraudulent transfers, the Receiver may avoid the Transfers, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and under California common law on fraudulent transfers.

144.   The Receiver may recover the Transfers for the benefit of the Receivership Estate from the Defendant or from the entity or entities for whose benefit the Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

145.   As a direct and proximate result of DLIF's fraudulent Transfers to Defendant, DLIF and the Receivership Estate have been diminished by in excess of $49 million, and the remaining assets of DLIF and the Receivership Estate are insufficient to pay DLIF's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF who were defrauded by the Receivership

1   Entities.

2      146.   The Receiver is entitled to damages from Defendant in a sum of not less

3   than $49,774,952.67 with interest as provided by law from the date of each payment.

4                          **SECOND CLAIM FOR RELIEF**

5   **(For Avoidance and Recovery of Fraudulent Transfers Pursuant to California**

6      **Civil Code §§ 3439.04(a)(2), 3439.05, 3439.07(a)(1), and 3439.08(b) and**

7                              **California Common Law)**

8      147.   The Receiver incorporates by this reference paragraphs 1 through 146,

9   above, as though set forth herein in full.

10     148.   This is a claim to avoid and recover fraudulent transfers, pursuant to Cal.

11  Civil Code, §§ 3439.04(a)(2) and 3439.05 and pursuant to California common law on

12  fraudulent transfers.

13     149.   The Receiver may recover the Fictitious Profits for the benefit of the

14  estate from the Defendant or from the entity or entities for whose benefit the Fictitious

15  Profits were made, or any immediate or mediate transferee of such initial transferee

16  pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

17     150.   DLIF transferred the Fictitious Profits to the Defendant.

18     151.   The Fictitious Profits were transferred to Defendant without Defendant

19  giving a reasonably equivalent value to DLIF in exchange for the Fictitious Profits.

20     152.   At the time the Fictitious Profits were paid to Defendant, DLIF was

21  engaged in or was about to engage in a business or transaction for which DLIF's

22  remaining assets were unreasonably small in relation to the business or transaction.

23     153.   At the time the Fictitious Profits were paid to Defendant, DLIF was

24  insolvent and/or was engaged or was about to engage in a business or a transaction for

25  which the remaining assets of DLIF was unreasonably small in relation to the

26  business or transaction.

27     154.   At the time the Fictitious Profits were paid to Defendant, DLIF intended

28  to incur, or believed or reasonably should have believed it would incur, debts beyond

its ability to pay them as they became due.

155.   The Fictitious Profits paid to Defendant by DLIF were also paid in furtherance of DLIF's fraud and Ponzi scheme.

156.   DLIF and the other Receivership Entities had creditors whose claims arose before the Fictitious Profits were paid to the Defendant.

157.   The transfer of the Fictitious Profits to Defendant are avoidable by the Receiver.

158.   Because the payment of the Fictitious Profits is fraudulent under Cal. Civil Code §§ 3439.04(a)(2) and 3439.05, the Receiver may avoid the payment of the Fictitious Profits, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and pursuant to California common law on fraudulent conveyances.

159.   The Receiver may recover the Fictitious Profits for the benefit of the Receivership Estate from Defendant or from the entity or entities for whose benefit the Fictitious Profits were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

160.   As a direct and proximate result of DLIF's fraudulent transfers of the Fictitious Profits to Defendant, DLIF and the Receivership Estate have been diminished by in excess of $2.6 million and the remaining assets of DLIF and the Receivership Estate are insufficient to pay DLIF's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF who were defrauded by the Receivership Entities.

161.   The Receiver is entitled to damages from Defendant in a sum of not less than $2,616,252.67, with interest as provided by law from the date of each payment.

## THIRD CLAIM FOR RELIEF

### (For Unjust Enrichment)

162.   The Receiver incorporates by this reference paragraphs 1 through 161, above, as though set forth herein in full.

163.   DLIF conferred a benefit on Defendant when it made the payment of the Fictitious Profits, which were derived from monies invested by the DLIF investors, who were owed fiduciary duties by DLIF.

164.   As a direct and proximate result of Defendant's retention of the Fictitious Profits transferred to it, DLIF and the Receivership Estate have been diminished and, under the circumstances, equity dictates that Defendant should return the Fictitious Profits it received from DLIF and any assets it may have acquired with those funds, to the Receiver for the benefit of all of the defrauded investors. Defendant had knowledge of the benefit it received from DLIF as a result of the payment of the Fictitious Profits and voluntarily accepted and retained the benefit conferred.

165.   When DLIF made the transfer of the Fictitious Profits to Defendant, Defendant received fictitious profits in excess over Defendant's Principal investment.

166.   Those Fictitious Profits were not the result of legitimate business activities, but rather provided to Defendant in furtherance of the fraud systemic throughout DLI and DLIF.

167.   Had the NAV been correctly stated as of the date Defendant received the Fictitious Profits, Defendant would not have received the Fictitious Profits.

168.   Defendant was therefore unjustly enriched by an overpayment of $2,616,252.67 when Defendant fully redeemed its investment.

169.   The overpayment of $2,616,252.67 to Defendant came at the expense of the Receivership Entities.

170.   The Receiver could not and did have any knowledge of the Fictitious Profits before April 1, 2019, the day of his appointment.

171.   The Receiver is entitled to damages from Defendant in a sum of not less than $2,616,252.67, with interest as provided by law from the date of the full redemption.

## **PRAYER FOR RELIEF**

WHEREFORE, the Receiver respectfully requests that this Court enter judgment as follows:

**On the First Cause of Action:**

1. For judgment avoiding and recovering the Transfers;

2. For judgment against Defendant in the amount of $49,774,952.67.

3. For interest at the legal rate from the date of the Transfers.

**On the Second Cause of Action:**

4. For judgment avoiding and recovering the Fictitious Profits;

5. For judgment against Defendant in the amount of $2,616,252.67.

6. For interest at the legal rate from the date of the payment of the Fictitious Profits.

**On the Third Cause of Action:**

7. For judgment against Defendant in the amount of $2,616,252.67.

8. For interest at the legal rate from the date of the payment of Fictitious Profits.

**On All Claims for Relief**

9. For costs.

10. For such other and further relief as the Court deems appropriate.

## **JURY TRIAL DEMAND**

The Receiver respectfully demands a trial by jury of all issues triable to a jury.

RAINES FELDMAN LLP

DATED:      November 23, 2021

By:   */s/ Kathy Bazoian Phelps*
Kathy Bazoian Phelps
David A. Castleman
Counsel for Bradley D. Sharp,
Permanent Receiver

33